IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DA'JWAN QUINTAJ MONROE,<br>Plaintiff,<br>v.<br>CORPORAL RODRIGUEZ, *et al.*,<br>Defendants. | 1:25CV35 |

**MEMORANDUM OPINION, RECOMMENDATION, AND ORDER OF UNITED STATES MAGISTRATE JUDGE**

This case arises from events that took place during Da'Jwan Quintaj Monroe's pre-trial detention at the Moore County Detention Center in 2023 and 2024. Monroe, the plaintiff in this Section 1983 civil action, alleges that Corporal Rodriguez and Officer Wilkes, both with the Moore County Sheriff's Office, assaulted him without provocation, in violation of his right under the Fourteenth Amendment to be free from pre-trial punishment.

The defendants have moved for summary judgment and to seal certain documents provided in support thereof. Because the undisputed facts show that the defendants are entitled to judgment as a matter of law, it is recommended that the Court grant their motion for summary judgment. Further, because the defendants have not met the requisite sealing standard, their motion to seal is denied.

I. FACTS

The undisputed facts[1] show the following:

A. December 1, 2023 Incident: Use of the Drive Stun Weapon.

On December 1, 2023, Monroe was a pre-trial detainee at the Moore County Detention Center (MCDC) in the green area. *See generally* Docket Entry 28, Ex. C, Declaration of Justin Wilkes (hereinafter Wilkes Decl.) ¶ 8. At the time, the MCDC was divided into color-coded areas (red, blue, yellow, green) and security levels

[1] Monroe did not respond to the motion for summary judgment and filed an unverified complaint. Accordingly, the facts are taken from the sworn declarations and accompanying exhibits the defendants submitted in support of their motion.

ranging from maximum to low. *See id.* ¶ 4.

At approximately 8:45 am, Wilkes, then a detention officer (DO) at the MCDC, was conducting property pick up in administrative segregation with DO Sheffield. Monroe was standing handcuffed outside of his cell at the door; as Wilkes was collecting property in the cell, Monroe moved in front of the doorway and told Wilkes to stop searching his cell. *See id.* ¶ 8; *see also* Docket Entry 28, Ex. F, Declaration of Mary Sheffield (hereinafter Sheffield Decl.) ¶ 9.

When Wilkes finished, Monroe was supposed to return to his cell. *See* Wilkes Decl. ¶ 8. But, as Monroe did so, he yelled, "Fuck you! Fuck this place!" and something about a "bitch ass." *See* Sheffield Decl. ¶ 13. Wilkes began to remove Monroe's handcuffs through the food pass of the cell door. *See* Wilkes Decl. ¶ 9. Once Wilkes removed the left cuff, Monroe began to try to jerk away. *See id.*; *see* Sheffield Decl. ¶ 13. Wilkes used the tether to gain control of Monroe so he could remove the other handcuff. *See* Wilkes Decl. ¶ 9.

Before Wilkes could close the food pass door, Monroe put his arm through it and held it open. *See id.* ¶ 10; *see* Sheffield Decl. ¶ 14. Wilkes told Monroe multiple times to put his arm back in the cell, but Monroe refused. *See* Wilkes Decl. ¶ 10. Wilkes then gave Monroe two direct orders to pull his arm back or else he would be drive stunned. *See id.*; *see* Sheffield Decl. ¶ 15.

Monroe did not. *See* Wilkes Decl. ¶ 11. Wilkes then deployed his drive stun (conducted energy) weapon into Monroe's right arm for approximately one to two seconds. *See id.*; *see* Sheffield Decl. ¶ 16. Monroe pulled his arm back into his cell. *See* Wilkes Decl. ¶ 11; *see* Sheffield Decl. ¶ 16. His shoulder was not dislocated, *see* Wilkes Decl. ¶ 18, but he sustained injuries to his wrists from the handcuffs, *see* Docket Entry 28, Ex. D (documenting injuries through photographs). Shortly thereafter, a nurse at the MCDC visited Monroe. *See id.* ¶ 13.

Sheffield reported the incident, and MCDC personnel charged Monroe with a number of violations, including tampering with or destruction of any locking device, interfering with lockdowns or searches, failure to obey and follow orders, and use of profane language and/or gestures, or excessive noise. *See* Docket Entry 28, Ex. D.

B. April 9, 2024 Incident: Code Red and Use of the Restraint Chair.

Monroe was still a pre-trial detainee at the MCDC on April 9, 2024. At approximately 8:03 pm that evening, Corporal Rodriguez, DO Stanley, and DO Connor entered MCDC cell block blue levels 1 and 2 to return inmates to their cells post-exercise. *See* Docket Entry 28, Ex. G, Declaration of Abraham Rodriguez (hereinafter Rodriguez Decl.) ¶ 7.

At the time, detention officers at the MCDC used the term "code red" to refer to the highest-level emergency, indicating "a serious disturbance requiring immediate response. It signals a major incident . . . and typically triggers a full lockdown of the Detention Center." *See id.* ¶ 5.

Rodriguez told Monroe, who was detained in this area, to pack his belongings, turn around in his cell, and place both hands through the trap on the door. *See id.* ¶ 8. Monroe questioned why he was being moved, initially refused to comply, but ultimately acquiesced to being handcuffed and shackled. *See id.* ¶ 9. Rodriguez began to escort Monroe to green levels 1 / 2. *See id.* When they arrived at 102B green, Monroe attempted to wrestle out of Rodriguez's grip and yelled, "RODRIGUEZ! DON'T TOUCH ME MAN! ON GOD YOU NEED TO TAKE YOUR HANDS OFF ME BRUH!" *See id.* ¶ 10. Rodriguez told Monroe to stop moving evasively. *See id.* Monroe, in response, tried to push himself away from Rodgriguez and Brogan. *See id.* ¶ 11; *see also* Docket Entry 28, Ex. J, Declaration of Connor Brogan (hereinafter Brogan Decl.) ¶ 11 ("[Monroe] would stop or try to turn until Corporal Rodriguez told him to stop, then he would stop."). Rodriguez ordered Monroe to stop, but he did not. *See* Rodriguez Decl. ¶ 11. Rodriguez then placed Monroe against the sally port door. *See id.*

The sally port door in the MCDC is a secure, controlled entry area used to move inmates or staff between different secured sections of the facility. *See id.* ¶ 6. It is two interlocking doors or gates that are never opened at the same time, ensuring that one door is fully closed and locked before the next opens. *See id.*

Monroe continued to curse at Rodriguez and Brogan, at which time Rodriguez placed him on the ground on his stomach using "control techniques." *See id.* ¶ 12. Monroe then said, "on God you about to get this fucking lawsuit on your ass! You ain't even have to slam me Rodriguez! You just a bitch ass nigga on God! Fuck off nigga!" *See id.* ¶ 13. Brogan called for a Code Red while assisting Rodriguez in subduing Monroe. *See id.* Monroe yelled, "Call the code! Call the code nigga! Call the code!" *See id.*

DOs Freeman and James arrived; Rodriguez directed them to use a four-point carry to take Monroe out of the sally port. *See id.* ¶ 14. Freeman and James carried Monroe out of the sally port and placed him onto the floor outside of the exercise day room of green levels 1/ 2. *See id.* ¶ 15. Rodriguez helped the other officers place Monroe in a temporary restraint system consisting of a shoulder harness, leg restraints, and an ankle strap that secures the person in an upright seated position, reducing the risk of potential asphyxia and preventing the occupant from harming himself or others. *See id.* Rodriguez took Monroe, in these restraints, into an area for a two- hour cool down period. *See id.* ¶ 16. Rodriguez confirmed that he could fit

at least one finger between the handcuffs. *See id.* He advised Monroe that he would be monitored four times an hour for danger to others. *See id.*

As he was doing so, Monroe lodged various slurs at Rodriguez, telling him that he was a "fucking gay ass nigga" and telling him to "[g]o and suck some dick." *See id.* ¶ 17.

Rodriguez prepared an incident report documenting what took place and MCDC personnel charged Monroe with a number of infractions arising from it, including threatening staff, participation in a disturbance, failure to obey and follow orders, disorderly conduct, use of profane language and/or gestures, or excessive noise, and code red. *See* Docket Entry 28, Ex. H.

C. The November 19, 2024 Incident: Use of the OC Spray Can.

On this day, at approximately 1:20 am, Rodriguez learned about an ongoing situation with Monroe and DO Holder in the yellow level of the MCDC. *See* Rodriguez Decl. ¶ 22.

Rodriguez went to yellow level 1, cell 114 and directed Monroe to put on his jumpsuit and place both hands through the food pass so he could be handcuffed. *See id.* ¶ 23. Instead, Monroe began packing up his items and continued to do so even after Rodriguez directed him to stop. *See id.* Rodriguez told Monroe to come to the door; Monroe responded: "Nah, you can wait. I can pack my stuff. I don't trust you CO's." *See id.* ¶ 24. Monroe then continued to refuse, saying, "fuck no." *See id.*

Rodriguez then deployed a two-second burst of his OC spray can into Monroe's right eye and the side of his face. *See id.* ¶ 25. Monroe replied, "you a jackass for that! You a real hoe for that shit!" *See id.* Sergeant Danley arrived to help Rodriguez, who again instructed Monroe to place both arms through the food pass. *See id.* ¶ 26. Again, Monroe refused, saying, "I'm not going anywhere with you alone! . . . You need to call your back up right now!" *See id.*

After Rodriguez threatened to use the OC fogger, Monroe complied. *See id.* While Rodriguez was taking Monroe to red level 1, Monroe would jerk away and say, "[D]on't fucking push me!" *See id.* ¶ 27. Rodriguez instructed Monroe to be quiet, but he refused. *See id.* Once at red level 1, cell 113, Rodriguez asked Monroe if he wanted to be decontaminated, and Monroe indicated he did. *See id.* ¶ 28. Rodriguez then used the pump sprayer to decontaminate Monroe and secured him in the cell. *See id.*

A short time later, around 1:50 am, when Rodriguez returned to the lower housing unit with fresh clothes for Monroe, he heard a loud banging noise coming from cell 113. *See id.* ¶ 29. When he arrived at the cell, he saw the door being rattled. *See id.* ¶ 30. Rodriguez told Monroe to turn around and place both hands through the food pass to be handcuffed. *See id.*

¶ 31. At the time, Rodriguez intended to take him out of the cell block and place him in the restraint management chair. *See id.*

Rodriguez and DO Holder worked together to place Monroe in the chair once they escorted him out of the cell block. *See id.* ¶ 33. Monroe attempted to jerk his left arm away during the process. *See id.* In response, Rodriguez applied pressure underneath Monroe's jawline, using both his middle and index finger while keeping away from his throat. *See id.* ¶ 34. Monroe yelled, "GET YOUR FUCKING HANDS AWAY FROM MY THROAT! GET YOUR FUCKING HANDS OFF MY THROAT!" *See* Docket Entry 28, Ex. P. Rodriguez stopped as soon as Monroe was secured. *See id.* Monroe was taken to the exercise room for a two-hour cool down period. *See* Rodriguez Decl. ¶ 36. He continued to yell once there, stating (among other things): "I'm coming after everyone in here! God has a plan and im [sic] going to sue everyone in this bitch." *See id.*

MCDC personnel advised the nurse in the facility both when Rodriguez sprayed Monroe and when he was placed in the restraint chair. *See* Docket Entry 28, Ex. O, Declaration of Seth Danley (hereinafter Danley Decl.) ¶¶ 18, 19.

Rodriguez prepared an incident report documenting what took place and MCDC personnel charged Monroe with a number of infractions arising from it, including threatening staff, kicking/beating cell door, failure to obey and follow orders, and participation in a disturbance. *See* Docket Entry 28, Ex. P.

D. The December 31, 2024 Incident: Contraband in Monroe's Cell.

On this date, Monroe was still a pre-trial detainee at the MCDC. At approximately 10:30 pm that evening, DOs Edmonds and Hudson were returning property in green levels 1 /2 during routine facility operations. *See* Docket Entry 28, Ex. R, Declaration of Dalton Edmonds (hereinafter Edmonds Decl.) ¶ 7. Hudson was searching each cell while Edmonds watched. *See id.* ¶ 8. At green 110, Monroe's cell, Edmonds watched Monroe while Hudson searched the cell. *See id.* ¶ 9. While she was running her handcuff key between the support bar for the desk and the wall, Edmonds heard an object hit the floor. *See id.* Hudson then handed Edmonds a mustard packet containing three red circular pills. *See id.* ¶ 10.

Monroe began repeating that Hudson planted the pills there. *See id.* Edmonds showed the pills to Rodriguez and Danley; Rodriguez identified them as 200 mg ibuprofen pills and noted that the nurse typically provides Monroe with white-colored 600 mg ibuprofen tablets. *See id.* ¶ 11. Hudson filled out an incident report related to the search, and MCDC personnel charged Monroe with various infractions, including hoarding of medications, lying to

staff, contraband, and misuse or abuse of authorized medications or possession of unauthorized medications. *See* Docket Entry, Ex. S.

E. Monroe's Disciplinary Record.

In addition to the incident reports provided in connection with the events described above, the defendants have also submitted Monroe's full disciplinary record from his tenure at the MCDC, which spans 357 pages. *See* Docket Entry 28, Ex. A.

## II. PROCEDURAL HISTORY

Monroe filed this Section 1983 suit, alleging in an unverified complaint that Rodriguez (sued in his individual and official capacities), a "Major Flint" (sued in his official capacity),[2] Edmonds (sued in his individual and official capacities), and Wilkes (sued in his individual capacity) violated his constitutional rights. *See* Docket Entry 2 (hereinafter Compl.). Monroe detailed a "statement of claims" describing his version of the events above and cites the violated rights as "medial treatment/physcological [sic] Medicine," "Phonecall/ communication," "Food Nourishment," "Harassment," and "cruel/unusual punishment." *See id.* at 3-4.

The defendants answered, *see* Docket Entry 15, and the magistrate judge set a discovery schedule, *see* Docket Entry 16. The defendants moved for summary judgment and to seal exhibits provided in connection therewith, *see* Docket Entries 26 and 29, and Monroe requested an extension of time to respond, *see* Docket Entry 31, which the magistrate judge granted, *see* Docket Entry dated 02/02/2026.

The Clerk mailed Monroe the standard Roseboro letter informing him of the motion and his right to respond. The letter warned Monroe that if he failed to respond to the motion, the Court may "conclude that the defendant['s] contentions are undisputed" and grant judgment in their favor. Docket Entry 30. *See also* M.D.N.C. Civ. L.R. 7.3(k) ("If no response brief is filed within the time required by this rule, the motion will be considered and decided as an uncontested motion, and ordinarily will be granted without further notice."). Despite the Court's warning, Monroe has not responded to the motion,[3] nor did he verify the

[2] While the undisputed facts reference a MCDC employee named William Flint and contain an affidavit from him authenticating the exhibits filed in support of the motion for summary judgment, *see generally* Docket Entry 28 and *see id.*, Ex. X, there is no evidence of his involvement in any of the incidents referenced in the complaint. Accordingly, the Court should dismiss all claims against "Major Flint."

[3] There is also no entry on the docket of the Roseboro letter being returned as undeliverable. Therefore, it is presumed that Monroe received it.

factual allegations in his Complaint, *see* Docket Entry 2, such that they could be considered as more than mere allegations, *see Gowen v. Winfield*, 130 F.4th 162, 175-76 (4th Cir. 2025).

Nevertheless, the Court cannot summarily grant the motion because Monroe's failure to respond "does not fulfill the burdens imposed on moving parties by Rule 56 [of the Federal Rules of Civil Procedure]." *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993). "Rule 56 requires that the moving party establish, in addition to the absence of a dispute over any material fact, that it is 'entitled to a judgment as a matter of law.'" *Id.* Thus, although Monroe's failure to respond may leave the defendants' facts uncontroverted, they "must still show that the uncontroverted facts entitle [them] to 'a judgment as a matter of law.'" *Id. See also Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55-56 (4th Cir. 1994) (noting that, even if the absence of a response, "the court should look at the movant's own papers . . . [and] determine if the record of filed depositions, answers to interrogatories, admissions, and affidavits[] demonstrates that a genuine issue exists as to any material fact").

These matters are ripe for disposition.

## III. STANDARD OF REVIEW

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In analyzing a summary judgment motion, courts "must construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Bandy v. City of Salem*, 59 F.4th 705, 709 (4th Cir. 2023).

The moving party bears the burden of establishing the absence of a genuine dispute of material fact by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Rule 56).

"Where, as here, the nonmoving party bears the ultimate burden of proof at trial, the moving party may discharge its initial burden at summary judgment by 'showing – that is, pointing out to the . . . court – that there is an absence of evidence to support the nonmoving party's case.'" *Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165, 174 (4th Cir. 2024) (quoting *Celotex Corp.*, 477 U.S. at 325). "If the moving party carries this initial burden, the burden then shifts to the nonmoving party, who must 'go

beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324).

"An affidavit or declaration used to support [summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

Finally, a party cannot rely on statements in a brief to support a motion for summary judgment, because they are not evidence. *City of Greensboro v. Guilford Cnty. Bd. of Elections*, No. 15-CV-559, 2017 WL 11488724, at *1 n.4 (M.D.N.C. Jan. 26, 2017) (collecting cases); *see also Hill v. Carvana, LLC*, No. 22-CV-37, 2022 WL 1625020, at *3 (M.D.N.C. May 23, 2022).

## IV. GOVERNING LAW

Title 42, United States Code, Section 1983 "is a federal statutory remedy available to those deprived of rights secured to them by the Constitution and, in a more sharply limited way, the statutory laws of the United States" by persons acting under color of state law. *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). A plaintiff bringing suit pursuant to § 1983 must show that a person acting under color of state law violated a constitutional or other federal legal right. *West v. Atkins*, 487 U.S. 42, 48 (1988).

### A. Excessive Force

Here, the first constitutional right at issue is the right to be free from an officer's use of excessive force, derived from the Fourteenth Amendment. *See Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (noting that the Fourteenth Amendment "protects a pretrial detainee from the use of excessive force that amounts to punishment"); *see also Short v. Hartman*, 87 F.4th 593, 606 (4th Cir. 2023) ("[T]his Court extended *Estelle* from Eighth Amendment claims to Fifth and Fourteenth Amendment Due Process Clause claims, reasoning that 'due process is at least as co-extensive as the guarantees of the [E]ighth amendment.'") (quoting and citing *Loe v. Armistead*, 582 F.2d 1291, 1294 (4th Cir. 1978)).

To succeed on such a claim, a pretrial detainee must show only that the force "purposely or knowingly used against him was objectively unreasonable." *See Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* (quoting *Graham*, 490 U.S. at 396). And courts make this determination "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20

vision of hindsight[] . . . account[ing] for the legitimate interests that stem from [the government's] need to manage the facility . . . ." *See id.* (internal quotation and citation omitted) (alteration in original).

Courts may consider the following in weighing the reasonableness or unreasonableness of the force exerted: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *See id.*

The United States Supreme Court recognized in *Kingsley* that "[o]fficers facing disturbances 'are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'" *Id.* (quoting and citing *Graham*, 490 U.S. at 397). Therefore, it has directed courts to judge the reasonableness of the force applied "from the perspective and with the knowledge of the defendant officer. We have also explained that a court must take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." *See id.* at 399-400.

### B. Deliberate Indifference to Serious Medical Needs

Monroe's claim also sounds in deliberate indifference, also derived from the Fourteenth Amendment due process clause.

In *Whisenant v. Yuam*, 739 F.2d 160, 164 (4th Cir. 1984), the Fourth Circuit Court of Appeals adopted an objective test for Fourteenth Amendment claims of deliberate indifference to serious medical needs, derived from the Supreme Court's holding in *Bell v. Wolfish*, 441 U.S. 520, 535 (1979), wherein the Court held that "[i]n evaluating the constitutionality of conditions or restrictions of pretrial detention . . . the proper inquiry is whether those conditions amount to punishment of the detainee." "The Court in *Bell* explained that whereas the Eighth Amendment only protects post-conviction detainees from 'cruel and unusual punishment,' the Fourteenth Amendment Due Process Clause protects pretrial detainees from being punished at all." *Short*, 87 F.4th at 606 (citing *Bell*, 441 U.S. at 535-37).

Thus, "deliberate indifference to serious medical needs violates the Fourteenth Amendment even in the absence of subjective intent to punish because no legitimate nonpunitive goal is served by a denial or unreasonable delay in providing medical treatment where the need for such treatment is apparent." *See id.* (internal quotation and citation omitted).

Thus,

> To state a claim for deliberate indifference to a medical need, the specific type of deliberate indifference claim at issue in this case, a pretrial detainee must plead that
>
> (1) they had a medical condition or injury that posed a substantial risk of serious harm;
>
> (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed;
>
> (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and
>
> (4) as a result, the detainee was harmed.

*Short*, 87 F.4th at 611.[4]

A serious medical need is one that has been "diagnosed by a physician as mandating treatment" or is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).

## V. DISCUSSION

As the moving party seeking summary judgment, the defendants bear the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 325.

There is no dispute that MCDC personnel exerted force in the three instances detailed in the complaint: specifically, the deployment of the drive stun weapon on December 1, 2023, the use of the restraint chair on April 9, 2024, and the deployment of the OC spray can on November 19, 2024.

As noted above, the *Kinglsey* Court directed courts to consider, in weighing excessive force claims under the Fourteenth Amendment, "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat

---

[4] In *Short*, the Fourth Circuit found that in Fourteenth Amendment deliberate indifference claims, "[t]he plaintiff no longer has to show that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm. . . . Now, it is sufficient that the plaintiff show . . . that the defendant should have known of that condition and that risk, and acted accordingly." *See* 87 F.4th at 611.

reasonably perceived by the officer; and whether the plaintiff was actively resisting." 576 U.S. at 397.

A. The Court Should Grant the Defendants' Motion for Summary Judgment as to the December 1, 2023 Incident.

As to the use of the drive stun weapon, it is well-settled in this Circuit that "[d]eploying a taser is a serious use of force. The weapon is designed to caus[e] . . . excruciating pain[.]" *See Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 902 (4th Cir. 2016) (internal quotation and citation omitted) (alteration in original). And the Fourth Circuit has determined that "tasers are proportional force only when deployed in response to a situation in which a reasonable officer would perceive some immediate danger that could be mitigated by using the taser." *See id.*

Under *Kingsley*, then, the need for the use of the taser must be commensurate with its impact. And here, the undisputed facts are that, preceding the drive stun, Monroe tried to prevent Wilkes from searching his cell, screamed obscenities at him, attempted to jerk away while having his handcuffs removed through the food pass door, and then held the food pass door open despite multiple commands to stop. *See* Wilkes Decl. ¶¶ 8-9, 13-14. Thus, "[a]s to the first *Kingsley* factor—the relationship between the need for the use of force and the amount of force used—the Court notes that [the officer]'s use of force to subdue Plaintiff was directly proportional to Plaintiff's refusal to follow commands and comply with officer directives in accordance with the policies and protocols of the Detention Center to maintain security and order. Thus, there was a clear relationship between the need for the use of force and the amount of force used." *See Brewton v. Wright*, No. 8:24-CV-07655-RMG-WSB, 2026 WL 2087978, at *14 (D.S.C. June 12, 2026), *report and recommendation adopted*, 2026 WL 2086996 (July 20, 2026) (granting summary judgment to officer defendant who tased resistant plaintiff in detention center).

As to the extent of Monroe's injury, there is no evidence that he sustained one from the use of the drive stun. *See, e.g., Jones v. Henderson Cnty. Det. Ctr.*, No. 1:15-CV-132-FDW, 2017 WL 581324, at *5 (W.D.N.C. Feb. 13, 2017) (finding *Kingsley* injury prong not satisfied where the plaintiff "suffered only minimal injuries from the use of the TASER, including a hole where the barb of the TASER pricked him and the pain . . . from getting electrocuted. Plaintiff did not require any medication from these injuries.") (internal quotation and citation omitted). And while Monroe was inside of a cell at the time Wilkes used the drive stun weapon, limiting the weight of the security factor and the reasonably perceived threat, Monroe was actively resisting officer commands.

Weighing all of the *Kingsley* factors then, the undisputed facts establish

that Wilkes' exertion of force on December 1, 2023 was not excessive. And courts evaluating the use of force where plaintiffs obstruct food flaps have concurred. *See, e.g., id.*; *see also, e.g., Diamond v. Odedere*, C/A No. 1:22-cv-287, 2024 WL 230113, at *6 (M.D.N.C. Jan. 22, 2024) (granting summary judgment for defendant officers on excessive force claim where they used a short burst of chemical munitions to gain compliance of inmate blocking food flap), *report and recommendation adopted*, 2024 WL 1014123 (Mar. 8, 2024); *Jackson v. DeAngelo*, C/A No. 6:15-cv-3725-TMC-KFM, 2016 WL 4154688, at *4 (D.S.C. June 29, 2016) (granting summary judgment for defendant officers in food flap encounter, finding that the officer was "authorized to restore order and discipline when faced with a noncompliant inmate and to use appropriate force in relation to the level of noncompliance if necessary"), *report and recommendation adopted*, 2016 WL 4123900 (Aug. 3, 2016); *Lloyd v. MacNeish*, C/A No. 5:12-CT-3163-FL, 2015 WL 1391476, at *13 (E.D.N.C. Mar. 25, 2015) (granting summary judgment for defendant officers on excessive force claim, finding there was no evidence the officers "used force maliciously and sadistically" where they "engaged in a brief struggle with plaintiff to close the food slot door"); *Karavias v. Virginia*, C/A No. 7:12-cv-624, 2013 WL 3879701, at *3 (W.D. Va. July 26, 2013) ("Plaintiff's arms did not belong outside of his cell when returning the lunch tray, and his persistent refusal to comply with staff's orders required some type of force to restore discipline and order.").

And to the extent Monroe advances a deliberate indifference claim based on any medical care not provided to treat the effects of the drive stun weapon, there are no facts by which any reasonable jury could find in his favor. There is no evidence he sustained any injury at all, let alone met any of the other factors set forth in *Short*, 87 F.4th at 611.

Further, qualified immunity protects Wilkes from suit. This doctrine "'balances two important interests,' namely, the need to hold accountable public officials who exercise power irresponsibly, and the need to shield officials who perform their duties responsibly from 'harassment, distraction, and liability.'" *Byers v. Painter*, 173 F.4th 155, 160 (4th Cir. 2026) (quoting *Peason v. Callahan*, 555 U.S. 223, 231 (2009)). To determine if qualified immunity protects an officer, the court asks two questions: "(1) whether a statutory or constitutional violation occurred, and (2) whether the right was clearly established at the time of the violation." *Harrold v. Hagen*, 174 F.4th 393, 401-02 (4th Cir. 2026). "If the answer on either question is 'no,' the officer being sued is entitled to qualified immunity." *Id.* at 402.

Here, because there was no constitutional violation, Wilkes is entitled to qualified immunity.

B. The Court Should Grant the Defendants' Motion for Summary Judgment as to the April 9, 2024 Incident.

This incident also involves Monroe defying orders. At approximately 8:03 pm, Rodriguez went to Monroe's cell and directed him to pack his belongings and place both hands through the food flap door for handcuffing. *See* Rodriguez Decl. ¶ 8. Monroe questioned why he was being moved, initially did not comply, but ultimately did as ordered. *See id.* ¶ 9.

While Rodriguez was moving Monroe to a different level in the facility, Monroe attempted to wrestle out of his grip and began yelling at him. *See id.* ¶ 10. When Rodriguez told him to stop, Monroe tried to push himself away from Rodriguez and Brogan, who was assisting. *See id.* ¶ 11; *see also* Brogan Decl. ¶ 11. Monroe continued to curse at both officers; Rodriguez then placed him on the ground using "control techniques." *See* Rodriguez Decl. ¶ 12. Brogan called for a code red while helping Rodriguez subdue Monroe. *See id.* ¶ 13. Two other officers arrived and Rodriguez directed them to use a four-point carry to take Monroe out of the sally port to the exercise room, where officers put him in the temporary restraint chair. *See id.* ¶¶ 14-15. He remained there for two hours. *See id.* ¶ 16.

Officers may confine detainees in restraints to maintain "order and control" without per se violating the Constitution. *See Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996). "'Plaintiff's placement in a restraint chair . . . does not in and of itself constitute an excessive use of force, as the use of devices such as restraint chairs or four-point bed restraints have repeatedly been found to be constitutional when used appropriately.'" *Battle v. Richland Cnty.*, No. CV 8:23-CV-2653-RMG-WSB, 2025 WL 2918280, at *11 (D.S.C. July 30, 2025), *report and recommendation adopted*, 2025 WL 2754050 (Sept. 29, 2025) (quoting *Rodriguez v. Taylor*, C/A No. 9:08-cv-01027-RBH, 2008 WL 5244480, at *8 (D.S.C. Dec. 15, 2008)). As the Fourth Circuit noted in *Williams*, though, the length of time a detainee is restrained bears on the constitutionality of the force. *See* 77 F.3d at 764. There, the plaintiff stated a viable claim of excessive force after eight hours so confined. *See id.*

Here, MCDC personnel placed Monroe in the restraint chair for a two-hour cool down period with no further application of force, in response to disruptive behavior and failure to follow commands.

As to the first *Kingsley* factor, measuring the need for the force against the force exerted, Monroe had defied officer orders to be cuffed, then attempted to wrestle away from officers, requiring the officers to restrain him on the ground and call a code red to summon other officers to assist. Under these circumstances, where neither verbal commands nor handcuffs had managed Monroe's behavior, the use of the restraint chair

was not disproportionate to the need. As to the second *Kingsley* factor regarding the injury suffered, there is nothing in the record indicating Monroe was injured. Both of these factors weigh in the defendants' favor.

The same is true for the effort the officers made to temper the amount of force; they did not make use of any chemical spray, drive stun weapons, or physical force beyond that required to move Monroe from the floor to the restraint chair. While the record does not shed much light on any specific threat posed to the restraining officers, the general security issue was real, as evidenced by the need to call the code red, and it is undisputed that Monroe was resisting. Thus, the third, fifth, and sixth *Kingsley* factors weigh in the defendants' favor.

And courts have repeatedly found no constitutional violation in similar scenarios. *See, e.g., Evans v. S.L.R. Det. Ctr.*, No. 4:17-CV-2731-HMH-TER, 2019 WL 1026362, at *8 (D.S.C. Jan. 24, 2019) (finding no violation where plaintiff spent approximately two hours in restraint chair after officer found him biting his wrist under suicide watch), *report and recommendation adopted sub nom.*, *Evans v. Abraham*, 2019 WL 1022141 (Mar. 4, 2019); *Singleton v. Brown*, No. CV 9:15-2723-JMC-BM, 2016 WL 11200707, at *16 (D.S.C. Sept. 14, 2016) (holding that restraint in a chair for six hours was not a constitutional violation where no pepper spray had been used and there was no evidence of injuries), *report and recommendation adopted*, 2017 WL 942177 (Mar. 10, 2017), *aff'd*, 714 F. App'x 307 (4th Cir. 2018) (unpublished); *Mackey v. Anderson Cnty. Det. Ctr.*, No. CA 6:06-1180-GRA-WMC, 2007 WL 1656231, at *1 (D.S.C. June 6, 2007) ("Restraint in a chair for twelve hours is not a per se violation of plaintiff's Fourteenth Amendment rights."); *Blakeney v. Rusk Cnty. Sheriff*, 89 F. App'x 897, 899 (5th Cir. 2004) (unpublished) (holding that pre-trial detainee's rights were not violated when he was placed in restraint chair for twenty hours after he disobeyed orders and engaged in unruly, destructive practices, since the purpose was not punishment).

As referenced earlier, there is no evidence that Monroe suffered any injury, so any deliberate indifference claim would fail, as well. Moreover, because there was no constitutional violation, Rodriguez is entitled to qualified immunity.

This leaves the official capacity claim against Rodriguez. At all times relevant herein, he was serving as a corporal in the MCDC upon the sheriff's direction. *See* Rodriguez Decl. ¶ 2. An official capacity claim against Rodriguez is, therefore, a claim against the sheriff. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978) (noting that official capacity lawsuits "generally represent only another way of pleading an action against an entity of which an officer is an agent")); *Wong v. Guilford Cnty. Sheriff Dep't*, No. 1:23cv223, 2024

WL 85548, at *8 (M.D.N.C. Ja. 8, 2024) (finding the § 1983 official capacity claims against deputies redundant of the § 1983 claim against the sheriff), *report and recommendation adopted*, 2024 WL 5372414 (Jan. 30, 2024); *Parker v. Bladen Cnty.*, 583 F. Supp. 2d 736, 739 (E.D.N.C. 2008) ("[U]nder North Carolina law, a sheriff's deputy is an employee of the sheriff . . . .") (citation omitted).

But a sheriff cannot be vicariously liable for his deputy's actions under § 1983. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011); *Monell*, 436 U.S. at 691. A local government's "liability under Section 1983 attaches only to 'action [taken] pursuant to official . . . policy of some nature.'" *Hunter v. Town of Mocksville*, 897 F.3d 538, 554 (4th Cir. 2018) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 477 (1986)) (alteration in *Hunter*). A single decision may create an official policy "so long as that governmental unit possessed 'final authority to create official policy.'" *Id.* (quoting *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999)).

In other words, for the sheriff to be liable under § 1983, the deputy must have been "acting pursuant to an unconstitutional policy, practice, or custom of the [sheriff] during this time." *See Mashore v. Naves*, No. 1:24CV420, 2025 WL 1698479, at *3 (M.D.N.C. Apr. 24, 2025), *recommendation and report adopted*, 2025 WL 1697088 (June 17, 2025). Indeed, "under North Carolina law, the sheriff . . . has final policymaking authority over hiring, supervising, and discharging personnel in the sheriff's office." *Parker*, 583 F. Supp. 2d at 739.

Here, there are no genuine issues of material fact wherein a reasonable jury could find that Rodriguez, as an employee of the sheriff, was acting according to the sheriff's official policy of some nature. Accordingly, the Court should dismiss the claim against him in his official capacity, in addition to his individual capacity.

C. The Court Should Grant the Defendants' Motion for Summary Judgment as to the November 19, 2024 Incident.

Here, the force at issue involves MCDC officers deploying a two-second OC spray can burst into Monroe's face and putting pressure under his jaw while placing him in a restraint chair soon thereafter.

The encounter began when Rodriguez went to Monroe's cell based on an "ongoing situation" involving another officer. *See* Rodriguez Decl. ¶ 22. He told Monroe to put on his jumpsuit and put his hands through the food pass for handcuffing. *See id.* ¶ 23. Monroe did not do so. He began packing up his items, even after Rodriguez told him to stop, telling Rodriguez: "fuck no." *See id.* ¶ 24. Rodriguez then deployed a two-second burst of his OC spray can in Monroe's face. *See id.* ¶ 25.

Monroe still would not put his arms in the food pass. *See id.* ¶ 26. Once Rodriguez threatened to use the OC fogger, Monroe complied. *See id.* As Rodriguez and Sergeant Danley were taking Monroe to red level 1, Monroe jerked away, said, "don't fucking push me," and continued to make noise after Rodriguez told him to be quiet (this was at approximately 1:20 am). *See id.* ¶¶ 26-27. Once they were in the red level, Rodriguez used the pump sprayer to decontaminate Monroe and secured him in cell 113. *See id.* ¶ 28.

Minutes later, Monroe began rattling the door of his cell, which made a loud banging noise. *See id.* ¶¶ 29-30. Rodriguez decided to take him off the cell block and place him in the restraint chair. *See id.* ¶ 33. Rodriguez and DO Holder worked together to place Monroe in the chair once they escorted him off of the cell block. *See id.* ¶ 33. Monroe attempted to jerk his left arm away during the process. *See id.* In response, Rodriguez applied pressure underneath Monroe's jawline, using both his middle and index finger while keeping away from his throat. *See id.* ¶ 34. Rodriguez stopped as soon as Monroe was secured. *See id.* Monroe was taken to the exercise room for a two-hour cool down period. *See id.* ¶ 36. He continued to yell once there, stating (among other things): "I'm coming after everyone in here! God has a plan and im [sic] going to sue everyone in this bitch." *See id.*

MCDC personnel advised the nurse in the facility both when Rodriguez sprayed Monroe and when he was placed in the restraint chair. *See* Danley Decl. ¶¶ 18, 19.

1. The OC spray

As to the OC spray, "[i]t is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." *See Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008) (citation modified). Prison officials can lawfully use certain chemical substances, including OC spray or mace, though, to regain "order and discipline and to maintain institutional security." *Hudson v. McMillan*, 503 U.S. 1, 6 (1992). *See also Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996) ("[M]ace can be constitutionally used in small quantities to . . . control a recalcitrant inmate.") (internal quotation omitted). "Furthermore, because a limited use of mace constitutes a relatively mild response compared to other forms of force, the initial application of mace indicates a tempered response by the prison officials." *See id.* (internal quotations omitted).

As with the two earlier incidents, *Kingsley* requires a comparison between the force exerted and the need for it. And the court should consider this from the vantage point of what the officer knew at the time, taking into account the need to manage the facility where Monroe was detained. Here, as documented

above, Monroe had a pattern of disruptive behavior. He would repeatedly disobey orders. Rodriguez witnessed some of these incidents. It was almost 2 am in a detention center. Reasonably, Rodriguez had every reason to believe that simple commands would not be obeyed (and indeed, here, they were not). He administered a brief burst of the OC spray (which, it should be noted, still did not deter Monroe). The force was commensurate with the need, and this factor weighs in favor of granting the motion. *See, e.g.*, *Boose v. Adkins*, No. 3:18-cv-1480, 2020 WL 3086885, at *13 (S.D. W. Va. May 20, 2020) (explaining that "[c]ourts in this Circuit have routinely held that law enforcement and correctional officers may deploy force in response to threatening, disruptive, or assaultive behavior") (collecting cases), *report and recommendation adopted*, 2020 WL 3078333 (June 10, 2020).

As the extent of the injury, there is no evidence in the record that Monroe suffered one. This, too, weighs in favor of the defendants. However, Rodriguez did not appear to make many attempts to limit the amount of force, nor was the severity of the problem paramount. The fourth and fifth factors thus weigh in Monroe's favor. The sixth does not: as with the two earlier incidents, he was actively resisting. And continued resisting after Rodriguez deployed the two-second burst of OC spray. Overall, under *Kingsley*, based on these facts, no reasonable jury could find that Rodriguez acted unreasonably in securing Monroe's compliance.

Likewise, there are no facts by which a reasonable jury could find that he was deliberately indifferent to Monroe's medical needs, either. Rodriguez promptly decontaminated him, and there is no evidence that Monroe suffered any injury from the encounter. Any Fourteenth Amendment claims arising from the OC spray incident fail.

Accordingly, because there were no constitutional violations, Rodriguez is also entitled to qualified immunity and the claim against him in his individual capacity does not survive summary judgment. Likewise, there are no facts by which a reasonable jury could find that he was acting pursuant to a policy of the sheriff, so any claims against him in his official capacity are equally doomed.

2. Hands on the jawline and the restraint chair

As referenced earlier, Monroe struggled when Rodiguez and Holder were attempting to secure him in the restraint chair, and so Rodriguez applied pressure to his jawline to gain his compliance. The record contains no information about how long Rodriguez maintained his hold; it only indicates that he stopped as soon as Rodriguez submitted. There is also no information about any injuries Rodriguez may have suffered from the encounter.

Under the first *Kingsley* factor, it was appropriate for Rodriguez to exert some measure of force; Monroe was actively struggling with him and another officer. And there is no evidence of injury. In fact, the record contains definitive evidence that Monroe's airway was not constricted; as Rodriguez applied force to his jawline, he yelled, "GET YOUR FUCKING HANDS AWAY FROM MY THROAT! GET YOUR FUCKING HANDS OFF MY THROAT!" *See, e.g., Martin v. Shaw*, No. 7:19CV00760, 2021 WL 650891, at *4 (W.D. Va. Feb. 19, 2021) ("The officers and Martin also offer evidence that he was able to talk during the wheelchair ride, making it unreasonable for any fact finder to be persuaded . . . that Lt. Shaw's grip [] significantly restricted his breathing."). The first two factors thus weigh in the defendants' favor. Rodriguez did make an effort to limit the force – he did not make use of the OC spray or the drive stun weapon – and he only used force until Rodriguez complied. This weighs in the defendants' favor.

Likewise, both the threat to the officer and the security threat were real, as Monroe was physically struggling with two officers. Finally, he was actively resisting. Thus, the fourth, fifth, and sixth *Kingsley* factors all support Rodriguez's actions here. Accordingly, based on the undisputed facts, no reasonable jury could find that Rodriguez acted unreasonably in this application of force.

And because the record is devoid of any evidence of Monroe suffering any injury therefrom, any deliberate indifference claim fails, as well.

Again, because there were no constitutional violations, Rodriguez is also entitled to qualified immunity, and the Court should grant summary judgment as to the claim against him in his individual capacity. Likewise, there are no facts by which a reasonable jury could find that he was acting pursuant to a policy of the sheriff, so the Court should grant the motion against him in his official capacity.

D. There Are No Viable Constitutional Claims Arising from the December 31, 2024 Encounter.

Monroe appears to allege in his unverified complaint that officers, including named defendant Edmonds, planted contraband in his cell during a search of it on this date. Even if it was undisputed that any of the named defendants did so, that conduct does not give rise to any recognized constitutional claim. The closest fit is a First Amendment retaliation claim, i.e., that the defendants planted the contraband in Monroe's cell in retaliation for protected conduct. *See, e.g., Rollins v. Bond*, No. CV 5:25-CV-P78-JHM, 2025 WL 2734655, at *3 (W.D. Ky. Sept. 25, 2025) (recognizing that prison officials planting contraband for retaliatory purposes could give rise to a Section 1983 claim if properly pled). But the Court is not required to advance Monroe's claims for him. As the Fourth Circuit recently reiterated:

> [W]hen the thrust of a complaint points to an "essential grievance," courts are not required to scour pleadings for stray phrases that could, with the benefit of hindsight, be consistent with another theory, and then construe those phrases to assert separate claims. After all, district courts are not the legal advocates of pro se litigants. Nor are courts required to anticipate all arguments or "explore exhaustively all potential claims of a pro se plaintiff" that are not readily apparent from the allegations.

*See Jackson v. Dameron*, 171 F. 4th 641, 650 (4th Cir. 2026) (internal citations omitted).

And even if he had properly pled this claim, the undisputed facts – based on the sworn affidavits the defendants submitted in support of their motion – give no indication that any officer placed the contraband in Monroe's cell or, even if they had, that there was any retaliatory motive related thereto. Accordingly, there would be no genuine dispute of material fact, and Edmonds would be entitled to judgment as a matter of law, in any capacity.

E. The Defendants Have Not Met the Requisite Standard for Sealing.

Contemporaneous to filing their motion for summary judgment, the defendants filed a motion to seal Exhibit Y[5] in support of the motion, Monroe's medical records. *See* Docket Entry 29. In support thereof, the defendants simply cite "Local Civil Rules 26.1(a)(1) and 79.2," neither of which address the sealing process. This is insufficient.

It is well-settled that the public has a long-established right of access to judicial records. *See Nixon v. Warner, Commc'ns, Inc.*, 435 U.S. 589, 597 (1978); *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004). The right derives from two sources, the common law and the First Amendment. *United States ex rel. Oberg v. Nelnet, Inc.*, 105 F.4th 161, 170–71 (4th Cir. 2024). However, the right of access is not absolute and can be rebutted. *See Rushford v. New Yorker, Mag., Inc.*, 846 F.2d 249, 253 (4th Cir. 1988). The burden of establishing a right to limit public access is on the party claiming the need for confidentiality. *Id.*

The common law right of access applies to all judicial records but can be rebutted if "countervailing interests heavily outweigh the public interests in access." *Id.* The First

[5] While the defendants moved only to seal Exhibit Y, they filed every exhibit in support of their motion under seal rather than redacting Exhibit Y of that document.

Amendment right of access is narrower and applies only to particular judicial records and documents. *Doe v. Public Citizen,* 749 F.3d 246, 266 (4th Cir. 2014). To overcome the right of access based on the First Amendment a party must show "a compelling governmental interest" and that the restriction is "narrowly tailored." *Id.*

When documents are filed in connection with a dispositive motion, as here, the "more rigorous First Amendment standard … appl[ies]." *Va. Dep't of State Police*, 386 F.3d at 576 (explaining that once documents produced in discovery are "made part of a dispositive motion, they [have] lost their status as being raw fruits of discovery") (internal quotation and citation omitted). Thus, the defendants "must present specific reasons in support of [their] position." *See id.* at 575.

This they do not do, only making cursory reference to the nature of the documents and two inapplicable local rules. *See Musgrove v. Moore*, No. 1:19-CV-164, 2022 WL 19977408, at *2 (M.D.N.C. Apr. 20, 2022) ("The defendants' conclusory references to an assortment of statutes and regulations does not establish these records are confidential or show a compelling interest to justify sealing.") (citing *Va. Dep't of State Police*, 386 F.3d at 575). And "[f]ederal courts have recognized . . . that where a party voluntarily puts his or her medical information or status into issue, it is more difficult to find that the party's privacy interests constitute a compelling interest that outweighs the First Amendment right of access to documents, even if the documents are medical records." *See Johnson v. City of Fayetteville*, No.:12–cv–456, 2014 WL 7151147, at *11–12 (E.D.N.C. Dec. 11, 2014). As the court noted in *Musgrove* in denying such a motion to seal in a deliberate indifference case:

> While the Court recognizes that medical records are ordinarily kept confidential, that is not always the case when those records are important to a lawsuit the patient himself has brought. Mr. Musgrove has neither joined in the motion to seal nor expressed any concerns about the confidentiality of the materials, indicating he has no confidentiality concerns about the limited records at issue.

2022 WL 19977408, at *2.

Like Musgrove, Monroe has placed his medical condition at issue in his complaint. He has not joined in the motion to seal, and the defendants have not identified with the specificity required the justification therefor. Accordingly, the motion to seal is denied.

## VI. CONCLUSION

**IT IS HEREBY RECOMMENDED** that the Court **GRANT** the motion for summary judgment filed under Docket Entry 26.

**IT IS HEREBY ORDERED** that the defendants' motion to seal, Docket Entry 29, is **DENIED**.

The clerk is directed to unseal Docket Entry 28.

______________________________
JoAnna Gibson McFadden
United States Magistrate Judge

August 27, 2026